IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

TEACHERS INSURANCE AND ANNUITY   :      CIVIL ACTION
ASSOCIATION OF AMERICA, et al.   :
                               :
      v.                     :
                               :
THOMAS BERNARDO, et al.       :      NO. 09-911

MEMORANDUM

Dalzell, J.                                 January 26, 2010

        Defendants Thomas Bernardo and Pamela Turner each claim to be the sole beneficiary of three of decedent John L. Turner's Teachers Insurance and Annuity Association of American and College Retirement Equities Fund ("TIAA-CREF") annuity contracts. Plaintiff TIAA-CREF filed this rule interpleader action seeking this Court's determination of the claims and counter-claims.[1] All three parties have moved for partial summary judgment seeking a declaratory judgment regarding who is the beneficiary of the annuities.

---

[1] As plaintiffs are New York corporations based in Charlotte, North Carolina or New York City, and defendants are citizens of New Jersey and Pennsylvania, we have the requisite diversity and the amount in controversy far exceeds the jurisdictional threshold.

1

## I. __Factual Background__[2]

In 1977, Dr. Turner was employed as a physician and professor at the University of Pennsylvania and was married to Pamela Turner. They had two children together. As an employee of the University of Pennsylvania, Dr. Turner was eligible to designate or direct contributions from his employer's basic retirement plan to fixed and variable annuity contracts issued by TIAA-CREF. Stip. at ¶ 12. On July 12, 1977 Dr. Turner executed an application form for a retirement annuity contract and certificate (the "July 12, 1977 Form"). Stip. at ¶ 13. TIAA-CREF issued contracts TIAA No. A825911-9 and CREF No. P825911-6 (the "A/P Contracts"), which became effective September 1, 1977. Stip. at ¶ 17. Dr. Turner listed his wife, Pamela Turner, as his primary beneficiary. Stip. at ¶ 15.

After a year-and-a-half of irreconcilable marital difficulties, on June 28, 1981, Dr. Turner moved out of the residence he shared with Pamela Turner and moved in with Thomas Bernardo. Stip. at ¶¶ 20-23. Dr. Turner and Mr. Bernardo lived together in Philadelphia until about 1995, when they moved to a jointly-owned home in New Jersey. Stip. at ¶ 82. Dr. Turner died on March 7, 2008 after living with Thomas Bernardo for twenty-seven years. Stip. at ¶¶ 23, 83.

---

[2]The parties signed a joint stipulation of facts ("Stip.") on September 11, 2009.

Dr. Turner worked for the University of Pennsylvania until 1981. Stip. at ¶ 9. He was thereafter an Assistant Professor at Temple University Hospital from 1981 to 1985, and then worked for Lombard Medical Associates, an affiliate of Graduate Hospital, from 1985 until his retirement in 1997. Stip. at ¶¶ 10-11.

Section 18 of the A/P Contracts states that "[b]y filing written notice with TIAA[-CREF] in form and wording satisfactory to TIAA[-CREF], which may include the application for this contract, the Annuitant may...designate or change the Beneficiary." Stip. at ¶ 19. On July 1, 1981, Dr. Turner executed a TIAA-CREF annuity contract and certificate application form (the "July 1, 1981 Form") at Temple University, where his employment gave him continuing eligibility to participate in TIAA-CREF. Stip. at ¶ 24. TIAA-CREF provided the Human Resources Department at Temple with the TIAA-CREF forms, and the Human Resources Department was responsible for assisting its employees with their TIAA-CREF policies. Stip. at ¶¶ 26-27.

Dr. Turner designated Thomas J. Bernardo as his primary beneficiary in Section 8 of the July 1, 1981 Form, and wrote the correct contract and certificate numbers of his A/P Contracts at the top of the form. Stip. at ¶¶ 29-30. TIAA-CREF contends that the July 1, 1981 Form was only to be used to apply to new

contracts, and was not the proper form it required to designate or change a beneficiary. Stip. at ¶ 31; Curran Dep. 110:18-110:23. In response to receiving the July 1, 1981 Form, TIAA-CREF sent Dr. Turner a January 21, 1982 letter (the "January 21, 1982 Letter"), that stated that the July 1, 1981 Form "has no force and effect and we are returning it to you for your records" and that "no changes will be made if we do not hear from you." Stip. at ¶¶ 33, 37. Nevertheless, in a move by TIAA-CREF that can at best be viewed as clerical error,[3] on that same letter a TIAA-CREF employee also checked off the box next to the statement that said, "The data in our records concurs with the information provided on this application," but did not check the box next to the statement that said, "If it was your intention to...Change your beneficiary designation, please complete and return the enclosed 'Designation of Beneficiary' form." Stip. at ¶¶ 38-9. TIAA-CREF agrees that it "communicated to Dr. Turner that the data in its records concurred with all of the information provided in the July 1, 1981 Form." Stip. at ¶ 40.

Divorce proceedings began on January 8, 1982, when Pamela Turner filed a Complaint in Divorce in the Philadelphia

---

[3] See, e.g., BRAZIL (Embassy International Pictures, 1985)("Well, your A. Buttle has been confused with...an A. Tuttle...I did not get the wrong man. I got the right man. The wrong man was delivered to me as the right man! I accepted him, on trust, as the right man. Was I wrong?")

Court of Common Pleas. Stip. at ¶ 42. Over three years later, Dr. Turner and Pamela Turner entered into a Property Settlement Agreement. Stip. at ¶ 45. That Agreement contains a mutual release provision and states that: "It is the intention of Wife and Husband to give to each other, by the execution of this Agreement, a full, complete and general release with respect to any and all property of any kind or nature, real, personal or mixed, which the other now owns or may hereafter acquire." Stip. at ¶¶ 46-7, Stip., Ex. 5. The divorce became final on October 18, 1985, when the Philadelphia Court of Common Pleas granted a Decree of Divorce to John and Pamela Turner on the ground of irretrievable breakdown. Stip. at ¶ 62. The June 26, 1985 Property Settlement Agreement was attached to, and incorporated by, the Decree. Stip. at ¶ 62. Pamela Turner proffers no evidence that she and Dr. Turner "ever entered into any agreement, contract or understanding, either explicit or implicit, written or oral, by which Dr. Turner agreed that Pamela Turner would remain the beneficiary of, or be entitled to, any portion of benefits from his TIAA-CREF annuity contracts." Stip. at ¶ 50.

On July 24, 1985, while the divorce remained pending, Dr. Turner executed an application for Supplemental Retirement Annuity Contracts (the "July 24, 1985 Form"). Stip. at ¶ 52.

Dr. Turner designated Thomas J. Bernardo as his primary beneficiary in section 8 of the July 24, 1985 Form, Stip. at ¶ 54, and also indicated on that Form that he intended to transfer funds from another 403(b) annuity contract by writing, in hand, "TIAA-CREF existing contracts" on that Form and included the A/P Contracts' numbers as the contracts out of which he would like to transfer funds. Stip. at ¶ 55. On September 1, 1985, TIAA-CREF issued the K/J Contracts pursuant to the July 24, 1985 Form, but the funds from the A/P Contracts were never transferred to the K/J Contracts. Although TIAA-CREF admits that Dr. Turner submitted this form "attempting to 'replace' the existing 'A' and 'P' contracts with the supplemental 'K' and 'J' contracts issued pursuant to graduate [sic] Hospital's supplement retirement plan," TIAA-CREF contends that it was unable to transfer the A/P Contracts to the K/J Contracts under the "applicable provisions of the Internal Revenue Code." TIAA-CREF Ans. to Countercl. ¶ 135, Stip. at ¶¶ 58-60.[4]

On March 26, 1990, Dr. Turner received a letter from Robert A. Ippolito, an employee in Information Services at TIAA-CREF, regarding "Beneficiary Change" (the "Ippolito Letter"). Although Dr. Turner must have made some inquiry regarding the beneficiary of his funds to prompt such a response, TIAA-CREF has

_____
[4]The L/M Contracts ultimately replaced the K/J Contracts on August 1, 1998. Stip. at ¶ 72.

6

no record of it.  Stip. at ¶¶ 65, 67.  The Ippolito Letter
enclosed a copy of the July 24, 1985 Form -- which named Thomas
Bernardo as Dr. Turner's primary beneficiary -- and stated,
"[e]nclosed is a copy of your current designation.  If you wish
this designation to remain in effect, you do not have to take any
further action."   Stip. at ¶ 63; Bernardo Mot. for Summ. J., Ex.
7.

On August 18, 1998, Dr. Turner executed an enrollment
form for TIAA and CREF Group Supplemental Retirement Annuity
Certificates while he was employed at Graduate Hospital as an
attending physician (the "August 18, 1998 Form").  Stip. at ¶ 68.
The August 18, 1998 Form designates Thomas Bernardo as Dr.
Turner's primary beneficiary and prompted TIAA-CREF to issue the
L/M Contracts to Dr. Turner.  Stip. at ¶¶ 70-1.  The L/M
Contracts replaced the K/J Contracts.  Stip. at ¶ 72.  The
parties do not dispute that Thomas Bernardo is the beneficiary of
the K/J Contracts and the L/M Contracts.  Stip. at ¶ 8.

Due to a change in operating platform, TIAA-CREF
separated out from the A/P Contracts the funds attributable to
each contributing employer's basic retirement plan (to wit, the
University of Pennsylvania, Graduate Hospital, and Temple
University).  Stip. at ¶ 73.  TIAA-CREF performed this separation
for internal administrative reasons; Dr. Turner did not initiate

it.  Stip. at ¶ 74.  The accumulations attributable to Dr.
Turner's retirement plan from the University of Pennsylvania were
separated into contracts TIAA No. D681849-8 and CREF No. V681849-
5 (hereinafter the "UPenn Contracts"), and were issued on August
1, 2005, effective as of October 1, 1979.  Stip. at ¶ 76.  The
accumulations attributable to Dr. Turner's retirement plan from
Graduate Hospital were separated into contracts TIAA No. D910590-
1 and CREF No. V910590-8 (hereinafter the "Graduate Hospital
Contracts"), and were issued on September 1, 2006, effective
January 1, 1988.  Stip. at ¶ 77.  The accumulations attributable
to Dr. Turner's retirement plan from Temple University remained
in the original A/P Contracts.  Stip. at ¶ 78.  It was TIAA-
CREF's policy to apply the participant's beneficiary designation
from the pre-separation contract to each of the newly separated
contracts.  Stip. at ¶ 75.

        Thus, TIAA-CREF recorded each of the three contracts as
having Pamela Turner as the primary beneficiary, even though
after 1977 Dr. Turner never listed or designated Pamela Turner as
a beneficiary of any of his annuity contracts.  TIAA-CREF also
did not after 1977 send Dr. Turner any documents showing Pamela
Turner as a beneficiary.  Stip. at ¶¶ 80-81.

        At the time of his death, Dr. Turner owned five sets of
annuity contracts with TIAA-CREF: the K/J Contracts and L/M

Contracts, of which Thomas Bernardo is the undisputed beneficiary, and the A/P, UPenn, and Graduate Hospital Contracts. Stip. at ¶¶ 7-8. As of Dr. Turner's death, the values of the contracts for which the beneficiary is in dispute were $167,621.12 for the A/P Contracts, $245,973.72 for the UPenn Contracts, and $52,365.33 for the Graduate Hospital Contracts. The total value of the three contracts when Dr. Turner died was $465,960.17. Stip. at ¶ 84.

On March 27, 2008, Thomas Bernardo contacted TIAA-CREF through his attorney, Ronda Goldfein, and requested full payment of all death benefits on Dr. Turner's contracts as Dr. Turner's designated beneficiary. Stip. at ¶ 86. TIAA-CREF informed Mr. Bernardo that he was the beneficiary only of the L/M Contracts, which had what it described as a "nominal amount." Stip. at ¶¶ 87-8. Over the next three months, Ms. Goldfein sent correspondence to various TIAA-CREF employees in support of Mr. Bernardo's claim as the beneficiary of all of Dr. Turner's annuity contracts. Stip. at ¶ 89. TIAA-CREF began reviewing Mr. Bernardo's claim, and eventually its Associate General Counsel, John Curran, informed Ms. Goldfein by letter that the L/M Contracts had what he now described as "modest or negligible balances." Stip. at ¶¶ 90-91. On July 30, 2008, TIAA-CREF deposited the proceeds of the L/M Contracts into Mr. Bernardo's

bank account in the net amount of $83,157.30.[5]  Stip. at ¶ 96.
Mr. Bernardo persisted in his claim to the benefits of Dr.
Turner's other annuity contracts as Dr. Turner's listed primary
beneficiary.  Stip. at ¶ 95.

Also on July 30, 2008, TIAA-CREF sent a letter to
Pamela Turner notifying her that she was the beneficiary of Dr.
Turner's A/P, UPenn, and Graduate Hospital Contracts.  Stip. at ¶
98.  TIAA-CREF sent Ms. Turner all of the necessary forms to
transfer Dr. Turner's remaining contracts into her name.  Stip.
at ¶ 99.  Ms. Turner had never submitted or initiated a claim for
death benefits on Dr. Turner's contracts.  Stip. at ¶ 100.  On
September 11, 2008, TIAA-CREF transferred ownership of the A/P,
UPenn, and Graduate Hospital Contracts to a contract under the
name of Pamela Turner.  Stip. at ¶ 102.  On October 6, 2008,
Pamela Turner sold 1388.9930 CREF Stock Units and transferred
them to the TIAA Traditional account in her name.  Stip. at ¶
103.  On January 2, 2009, she took cash withdrawals from her new
annuity contracts in the total amount of $1,549.93 ($58.39 from
the CREF Money market account, and $1,491.54 from the TIAA
Traditional account), in order to satisfy the Internal Revenue
Code required minimum distribution requirements.  Stip. at ¶ 104.

_____

[5]That is to say, the actual "nominal amount" or "negligible"
balance was $92,295.85 less ten percent federal income tax
withholding and less $2,283.55 "to pay off an existing plan
loan."  Stip. at ¶ 97.

On December 4, 2008, Ms. Goldfein sent TIAA-CREF a letter requesting the status of Mr. Bernardo's claim.  Stip. at ¶ 105.  One day before he was laid off from TIAA-CREF, Mr. Curran sent a January 14, 2009 letter to Ms. Goldfein advising that "the benefits have been distributed to the beneficiary(ies) listed in the records of TIAA-CREF, as provided for in the contracts." Stip. at ¶¶ 106-7.

On January 23, 2009, Ms. Goldfein contacted TIAA-CREF's General Counsel, Margaret Byrne, who agreed to review the file and to freeze Ms. Turner's accounts, pending resolution of the claim.  Stip. at ¶ 108-9.  On March 4, 2009, TIAA-CREF filed this Interpleader Complaint.

## II.  **Analysis**[6]

---

[6]Summary judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  On cross-motions for summary judgment, we will construe the facts and draw inferences "in favor of the party against whom the motion under consideration is made."  Pichler v. UNITE, 542 F.3d 380, 386 (3d Cir. 2008)(internal citations and quotation marks omitted).  Whenever a factual issue arises which cannot be resolved without a credibility determination, the Court must credit the non-moving party's evidence over that presented by the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).
     The moving party bears the initial burden of proving that there is no genuine issue of material fact in dispute. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585 (1986). Once the moving party carries this burden, the nonmoving party must "come forward with 'specific facts showing

The parties have agreed that there is no genuine issue of material fact, and that disposition on the issue of entitlement to the outstanding contracts is appropriate for summary judgment. Thus, the only issue for us to decide here is whether Dr. Turner's multiple attempts to designate Mr. Bernardo as the beneficiary of the A/P Contracts are legally sufficient to award Thomas Bernardo the proceeds of Dr. Turner's annuity contracts.

## A. Applicable Choice of Law

Federal courts apply the substantive law of their forum states in diversity actions. <u>Borse v. Piece Goods Shop, Inc.</u>, 963 F.2d 611, 614 (3d Cir. 1992)(citing <u>Erie Railroad Co. v. Tompkins</u>, 304 U.S. 64, 78 (1938)). Pennsylvania courts generally enforce choice-of-law provisions in contracts. <u>Kruzits v. Okuma Mach. Tool, Inc.</u>, 40 F.3d 52, 55 (3d Cir. 1994). The parties stipulate to the authenticity of all of the documents submitted,

---

there is a genuine issue for trial.'" <u>Id.</u> at 587 (quoting Fed. R. Civ. P. 56(e)). The non-moving party must present something more than mere allegations, general denials, vague statements, or suspicions. <u>Trap Rock Indus., Inc. v. Local 825</u>, 982 F.2d 884, 890 (3d Cir. 1992); <u>Fireman's Ins. Co. of Newark v. DuFresne</u>, 676 F.2d 965, 969 (3d Cir. 1982). It is not enough to discredit the moving party's evidence, the non-moving party is also required to "present affirmative evidence in order to defeat a properly supported motion for summary judgment." <u>Liberty Lobby</u>, 477 U.S. at 257. A proper motion for summary judgment will not be defeated by merely colorable evidence or evidence that is not significantly probative. <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 249-50. "[T]he burden on the moving party may be discharged by 'showing'...that there is an absence of evidence to support the nonmoving party's case." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986).

Stip. at ¶ 85, and the A/P Contracts each have a provision that states, "THIS CONTRACT IS MADE AND DELIVERED IN AND IS TO BE PERFORMED IN THE STATE OF NEW YORK. THE VALIDITY AND EFFECT OF THE CONTRACT ARE GOVERNED BY THE LAWS THERE IN FORCE." Bernardo Mot. for Summ. J., Ex. 2 at 3.

On the other hand, both the UPenn Contracts and the Graduate Hospital Contracts provide that "[t]his contract is made and delivered in and is to be performed in PENNSYLVANIA." Bernardo Ans., Ex. J at 2. TIAA-CREF and Pamela Turner argue that ERISA pre-empts state law under these circumstances and therefore ERISA applies. We need not parse the issue of which law applies because, as will be seen, the standard under each is the same.

### B. Strict Compliance

Section 18 of the A/P Contracts (which applies to the UPenn and Graduate Hospital Contracts as well) dictates that "[b]y filing written notice with TIAA [CREF] in form and wording satisfactory to TIAA [CREF], which may include the application for this contract, the Annuitant may...designate or change the Beneficiary." Stip. at ¶ 19; Bernardo Mot. for Summ. J., Ex. 2 at 5. Under the contracts, TIAA-CREF must also receive the notice and the notice must be signed by the annuitant: "No such...change will take effect unless received by TIAA [CREF],

but upon being so received it will take effect as of the date the notice was signed." Bernardo Mot. for Summ. J., Ex. 2 at 5.

On July 1, 1981, Dr. Turner sent TIAA-CREF a new application for a contract, but used it as a way to notify TIAA-CREF that he wanted to change the beneficiary of his A/P Contracts. He wrote the numbers of the contracts at the top of the page, included Thomas Bernardo's name, birth date, relationship ("friend"), and signed it at the bottom. Bernardo Mot. for Summ. J., Ex. 3. TIAA-CREF responded to this form with a letter that explained that because Dr. Turner already owned TIAA-CREF annuities, new contracts had not been issued and that all premiums would continue to be applied to the A/P Contracts. The letter said that the application had no force and effect, but below that the box was checked next to text that read: "The data in our records concurs with the information provided on this application." Bernardo Mot. for Summ. J., Ex. 4. No change of beneficiary form was included with this letter, Stip. at ¶ 41, nor was the box checked that suggested Dr. Turner should do something more to change his beneficiary. Bernardo Mot. for Summ. J., Ex. 4. Indeed, nothing in the A/P Contracts suggests that an annuitant must use a particular change of beneficiary form to change his beneficiary. A few years later, when Dr. Turner tried to transfer funds from his A/P Contracts into his K/J Contracts, he submitted yet another application form listing Thomas Bernardo as his beneficiary and indicated in section 9 of

that document that he intended to replace/transfer funds from "TIAA-CREF Existing Contracts." He also wrote in the numbers of his A/P Contracts. Bernardo Mot. for Summ. J., Ex. 6. On March 26, 1990, TIAA-CREF sent Bernardo the Ippolito Letter and included a copy of the July 24, 1985 Form. That letter stated, "[e]nclosed is a copy of your current designation. If you wish this designation to remain in effect, you do not have to take any further action." Bernardo Mot. for Summ. J., Ex. 7. Both forms contain the exact information that is required on a TIAA-CREF "Change of Beneficiary" Form. Bernardo Mot. for Summ. J., Ex. 14; Curran Dep. 115:10-120:1.

Construing Mr. Curran's testimony in the light most favorable to Bernardo and against Pamela Turner and TIAA-CREF, we find that Dr. Turner complied with TIAA-CREF's change of beneficiary requirements. He submitted written notice to the company demonstrating his desire to change his beneficiary, included all the information that would have been required on the official "Change of Beneficiary" form, signed the form, and TIAA-CREF received it. These are the only change of beneficiary requirements in his A/P Contracts, and he complied with them.

## C.  **Substantial Compliance**

Even construing Curran's testimony in the light most favorable to Pamela Turner,[7] we still find Thomas Bernardo to be

---

[7]Curran also testified in his deposition that "if there are no new contracts issued pursuant to an application, the

the beneficiary of Dr. Turner's annuities under the doctrine of substantial compliance. Under New York law, Pennsylvania law, and ERISA, where a dispute arises over entitlement to a plan participant's life insurance proceeds because of an alleged failure by the participant to change the designated beneficiary on the participant's life insurance policy, courts apply the doctrine of substantial compliance.

Under New York law, when an insurer brings an interpleader action to ascertain the beneficiaries on a policy, it waives the right to strict compliance with the policy's provisions. Metlife Life and Annuity Co. of Connecticut v. Sobie, 326 F. App'x 3, 5 (2d Cir. 2009) ("a change of beneficiary will be effective where there has been substantial compliance with the policy."). To determine whether the insured substantially complied with the policy, New York law looks to (1) whether the insured made her intent clear and (2) whether she took some affirmative action to accomplish the change. Id. If the insured has done "all that was reasonably possible to show h[er] intention or has made every reasonable effort to comply with the policy requirements, then substantial compliance with the terms of the policy will suffice to demonstrate the policyholder's intent." Id. (internal quotation marks omitted); McCarthy v. Aetna Life Insurance Co., 92 N.Y.2d 436, 440 (N.Y.

application's a nullity. This is not a form, which would be effective to make a beneficiary designation change on existing contracts." Curran Dep. 110:18-110:23.

16

1998).

Pennsylvania law is congruent with New York's on this point. "Pennsylvania courts will give effect to an insured's intention to change the beneficiary on an insurance policy where, even in the absence of strict compliance with the policy provisions, the insured has made every reasonable effort under the circumstances to comply with those provisions." Cipriani v. Sun Life Insurance Co. Of America, 757 F.2d 78, 81 (3d Cir. 1985); see Provident Mutual Life Insurance Co. Of Philadelphia v. Ehrlich, 508 F.2d 129, 132 (3d Cir. 1975); Stickney v. Muhlenberg College TIAA-CREF Retirement Plan, 896 F.Supp. 412, 418 (E.D. Pa. 1995); Teachers Insurance and Annuity Association of America v. Caul, No. 86-2568, 1986 WL 11705, *2 (E.D. Pa. Oct. 17, 1986)(Fullam, J.). As in New York, in Pennsylvania an insurer bringing an interpleader action waives the right to insist on strict compliance. Provident Indemnity Life Insurance Co. v. Durbin, 541 F.Supp. 4, 8 (E.D. Pa. 1981).

Under ERISA, "the fiduciary shall administer the plan 'in accordance with the documents and instruments governing the plan,' making payments to a 'beneficiary' who is 'designated by a participant, or by the terms of [the] plan.'" Egelhoff v. Egelhoff, 532 U.S. 141, 147 (2001)(citing 29 U.S.C. § 1104(a)(1)(D) and § 1002(8)) (internal citations omitted). ERISA is silent, however, on the issue of how a court should determine the proper beneficiary when faced with confusing plan documents,

as we are here.  Our Court of Appeals has looked to state

substantial compliance doctrine to ascertain the proper

beneficiary under an ERISA plan.  <u>Metropolitan Life Insurance Co.</u>

<u>v. Kubichek</u>, 83 F. App'x 425, 429 (3d Cir. 2003)(applying New

Jersey doctrine of substantial compliance).

TIAA-CREF and Pamela Turner argue that substantial

compliance doctrine is the exception rather than the rule,[8] but

---

[8]TIAA-CREF and Pamela Turner spill much ink discussing the recent
Supreme Court case, <u>Kennedy v. Plan Administrator for DuPont</u>
<u>Savings and Investment Plan et al</u>, 129 S.Ct. 865 (2009), in
support of this point.  In <u>Kennedy</u>, the decedent had a Savings
and Investment Plan (a "SIP," which is an ERISA-qualified plan)
through DuPont and had executed a single "plan document"
designating his wife, whom he later divorced, as the beneficiary.
<u>Id.</u> at 869.  He never executed any documents removing his ex-wife
as the beneficiary, although he did execute a new beneficiary-
designation form naming his daughter as the beneficiary under a
different plan -- his Pension and Retirement Plan -- which was
also an ERISA plan.  When Kennedy died, DuPont distributed the
funds from the SIP to Kennedy's ex-wife instead of to his
daughter, and the daughter, serving as executrix of Kennedy's
estate, sued, claiming that the divorce decree amounted to a
waiver of the SIP benefits.  There was no evidence that Kennedy
had ever tried to change the beneficiary of his SIP, nor did the
estate ever claim that there was evidence to that effect.  <u>Id.</u> at
869 n.2.  The Supreme Court found that while an ex-wife can waive
her right to the proceeds of a retirement plan, the ex-wife in
this particular case did not do enough to do so because no
successor-in-interest was named in the divorce decree.  <u>Id.</u> at
873.  In <u>Kennedy</u>, the Supreme Court cited <u>Mertens v. Hewitt</u>
<u>Associates</u>, 508 U.S. 248, 259 (1993), where the Court held that
"[t]he authority of courts to develop a 'federal common law'
under ERISA...is not the authority to revise the text of the
statute."  <u>Kennedy</u>, 129 S. Ct. at 877.  But because ERISA does
not advise us on how to read ambiguous documents on file with the
Plan, courts interpreting them cannot be accused of "revising the
text of the statute."  Thus, <u>Kennedy</u> does not address the issue
at hand, and we find it inapplicable.  The other cases that TIAA-
CREF and Pamela Turner cite in support of their argument are
similarly inapposite.  Courts have continued to use substantial
compliance in determining proper beneficiaries post-<u>Kennedy</u>.
<u>See</u>, <u>e.g.</u>, <u>Hartford Life Ins. Co. v. Einhorn ex rel. Mehring</u>, No.

in light of the number of courts who have ruled to the contrary, we disagree.  Every circuit that has addressed this issue has found that substantial compliance is the correct standard by which to determine the proper beneficiary of an ERISA plan.

To be sure, there is a split among the circuits regarding whether ERISA pre-empts state common law, obliging courts, if it does, to devise federal common law where ERISA is silent.  Thus, some circuits have applied federal common law standards where ERISA provides no guidance.  See Metropolitan Life Insurance Co. v. Johnson, 297 F.3d 558, 565 (7th Cir. 2002)(concluding that ERISA pre-empts the Illinois state law doctrine of substantial compliance and using the federal common law doctrine of substantial compliance); Phoenix Mutual Life Insurance Co. v. Adams, 30 F.3d 554, 565 (4th Cir. 1994)(finding that a federal common law of substantial compliance requiring the two-part test to determine whether an insured intended to change his beneficiary furthers the purposes of ERISA without compromising its integrity); Guardian Life Ins. Co. of America v. Finch, 395 F.3d 238, 242 (5th Cir. 2004)(finding that magistrate judge properly relied on federal common law when determining ex-wife had waived her rights under the life insurance plan); Hill v. AT&T Corp., 125 F.3d 646, 648 (8th Cir.1997)(finding that the issue of whether and how a divorce decree divests a person of beneficiary rights is not explicitly considered in ERISA and thus

04-2738, 2009 WL 5159247, at *22 (E.D.N.Y. Dec. 30, 2009).

is a question of federal common law).

Notably, however, the federal common law substantial compliance test is identical to New York's test.  Phoenix Mutual Life Insurance Co. v. Adams, 30 F.3d 554, 564 (4th Cir. 1994) (internal quotations omitted) ("Pursuant to federal common law, an insured substantially complies with the change of beneficiary provisions of an ERISA life insurance policy when the insured: (1) evidences his or her intent to make the change and (2) attempts to effectuate the change by undertaking positive action which is for all practical purposes similar to the action required by the change of beneficiary provisions of the policy.").

Other circuits, including ours, have decided that ERISA does not pre-empt state common law with regard to substantial compliance in determining the proper beneficiary under an ERISA plan.  See Metropolitan Life Insurance Co. v. Kubichek, 83 F.App'x 425, 429 (3d Cir. 2003)(applying New Jersey substantial compliance doctrine to evaluate ERISA plan's change of beneficiary policy); BankAmerica Pension Plan v. McMath, 206 F.3d 821, 829 (9th Cir. 2000)(district court erred in finding that ERISA pre-empted state law doctrine of substantial compliance); Peckham v. Gem State Mut. of Utah, 964 F.2d 1043, 1052 (10th Cir. 1992)("The doctrine of substantial compliance does not denigrate from an ERISA plan in a way that is significant enough to implicate the concerns underlying ERISA pre-emption.").

Thus, following the teaching of our Court of Appeals, whether Dr. Turner's contracts are ERISA qualified or not, we will look to the state law doctrines of substantial compliance to determine the proper beneficiary in this dispute. We will therefore analyze the issue under the substantial compliance doctrines of New York and Pennsylvania, reserving judgment regarding which law actually applies.

As we stated above, under New York law, the appropriate test is (1) whether the insured made his intent clear and (2) whether he took some affirmative action to accomplish the change. Metlife Life and Annuity Co. of Connecticut v. Sobie, 326 F.App'x 3, 5 (2d Cir. 2009); McCarthy v. Aetna Life Ins. Co., 704 N.E.2d 557, 560 (N.Y. 1998). If the insured did everything he could do to change the beneficiary of his plans, then substantial compliance will apply. Metlife Life and Annuity Co. of Connecticut v. Sobie, 326 F.App'x 3, 5 (2d Cir. 2009). Under Pennsylvania law, "[w]hen the insured's intent and attempted compliance is clear, a court will exercise its equitable power to carry out the manifested intent and not permit that intent to be frustrated." Cipriani v. Sun Life Ins. Co. of America, 757 F.2d 78, 82 (3d Cir. 1985)(quoting Provident Indemnity Life Insurance CO. v. Durbin, 541 F. Supp. 4, 8 (E.D. Pa. 1981)). If the insured has done everything possible to implement the change, Pennsylvania courts find substantial compliance. Cipriani, 757 F.2d at 81.

Dr. Turner substantially complied with TIAA-CREF's requirements for changing his beneficiary. He (1) made his intent clear when he conveyed to TIAA-CREF that he wanted Thomas Bernardo to be the beneficiary of the A/P Contracts, and (2) twice took the affirmative step of sending written notice to TIAA-CREF communicating his intent to designate Thomas Bernardo as his beneficiary. Considering the responses he received from TIAA-CREF twice confirming his designation, we find that Dr. Turner did everything he could do to change his beneficiary from his ex-wife to Thomas Bernardo. Under any of the laws that could be applied to this dispute, Dr. Turner satisfied the substantial compliance test. We therefore conclude that he changed his beneficiary to Thomas Bernardo.

III.  **Conclusion**

Since we have found that Thomas Bernardo is the beneficiary of all of Dr. Turner's TIAA-CREF annuity contracts, we will grant in part defendant Bernardo's motion for partial summary judgment and deny it without prejudice as to the request for attorneys' fees and costs. We shall deny TIAA-CREF's motion for partial summary judgment, and deny defendant Pamela Turner's motion for partial summary judgment.

Thomas Bernardo also filed a motion to strike the portions of TIAA-CREF's motion for summary judgment insofar as they address matters unrelated to the declaratory issue addressed

here.  We will deny Bernardo's motion to strike as moot.

BY THE COURT:

__\s\Stewart Dalzell